UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

LISA A. RASSETT,

                Plaintiff,

v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                Defendant.

Civil No. 10-3751 (DSD/AJB)

REPORT & RECOMMENDATION

## INTRODUCTION

Plaintiff Lisa A. Rassett disputes the unfavorable decision of the Commissioner of Social Security, denying her application for disability insurance benefits.  The matter is before this Court, United States Chief Magistrate Judge Arthur J. Boylan, for a Report and Recommendation to the District Court on the parties' cross-motions for summary judgment.  See 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1.  Plaintiff is represented by Edward C. Olson, Esq.  Defendant is represented by Lonnie F. Bryan, Assistant United States Attorney.  Jurisdiction is proper under 42 U.S.C. § 405(g).  Based on the reasoning set forth below, this Court recommends that Plaintiff's motion for summary judgment [Docket No. 15] be denied, and Defendant's motion for summary judgment [Docket No. 19] be granted.

## PROCEDURAL HISTORY

Plaintiff protectively filed an application for disability insurance benefits on March 11, 2007, alleging disability beginning September 2, 2003.  (Tr. 12, 90-101.)[1]  She alleged disability from chronic pain in the right knee, shin, ankle, foot, and toe; chronic pain in the right hip; chronic pain in the right arm, including elbow and forearm; and depression.  (Tr. 120.)  Her application was denied initially and upon reconsideration.  (Tr. 49-53, 56-58.)  Plaintiff timely requested a hearing before an administrative law judge, and the hearing was held on August 18, 2009, before Administrative Law Judge George Gaffaney ("ALJ").  (Tr. 21-43, 63-64.)  The ALJ issued an unfavorable decision on October 27, 2009.  (Tr. 9-20.)  On July 17, 2010, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-5.)  See 20 C.F.R. § 404.981.  On August 25, 2010, Plaintiff sought review from this Court.  The parties thereafter filed cross-motions for summary judgment.

## PLAINTIFF'S BACKGROUND AND MEDICAL HISTORY

Plaintiff was born on December 9, 1964, and was 38-years-old on the alleged onset date of disability.  (Tr. 254.)  She has one minor child, aged 16 at the time of the hearing.  (Tr. 28, 95.)  Plaintiff has a GED and no vocational training or education.  (Tr. 128.)  She worked in the relevant past as an interior painter and a knitting machine operator.  (Tr. 198.)

On August 24, 2003, Plaintiff was injured in a motorcycle accident.  (Tr. 254.)  She was a passenger on the motorcycle when a car coming through an intersection failed to stop and hit the motorcycle.  (Id.)  Plaintiff evidently flew off the motorcycle, skidded across the hood of the car, and landed on the street on her right side.  (Tr. 239, 254.)  Her right knee also hit the motorcycle

---

[1]     The Court will cite the Administrative Record in this matter [Docket No. 6] as "Tr."

peg. (Tr. 254.) She was treated with stitches in her left knee. (Id.) After the accident, Plaintiff began suffering from right knee pain. (Id.) Despite the pain, she continued to work as a painter until she was laid off in July 2004. (Tr. 120.)

## MEDICAL RECORDS

The medical record begins shortly after Plaintiff's motorcycle accident. An x-ray of her right knee taken on September 1, 2003, showed no abnormalities. (Tr. 256.) Later that month, Plaintiff saw her primary care physician, Dr. Tim Rumsey, complaining of pain in both knees. (Tr. 254.) Plaintiff stated that it hurt to bend her knees, but that she was able to work so long as she was standing. (Id.) She further said that her pain medications were not working. (Id.) An examination revealed scars below the left knee and mild swelling in the right knee, but no other objective abnormalities. (Id.) Dr. Rumsey allowed her to keep working as tolerated and suggested over-the-counter medications for pain. (Tr. 255.)

Plaintiff returned to Dr. Rumsey on November 3, 2003, complaining of worsening pain in her right knee and pain in her right elbow. (Tr. 253.) As to the knees, Dr. Rumsey noted painful palpation but no swelling. (Id.) As to the right elbow, an examination and x-ray showed no objective abnormalities. (Id.) Dr. Rumsey prescribed Vicodin for the pain. (Id.)

On June 9, 2004, Plaintiff saw Dr. Jack Bert at Summit Orthopedics. (Tr. 216.) Dr. Bert's examination of the right elbow showed "dramatic tenderness," pain with dorsiflexion stress, no effusion or instability, and "4/5" motor flexion and extension. (Tr. 216- 17.) An x-ray further showed no abnormalities. (Tr. 217.) Dr. Bert's examination of the knee showed "dramatic tenderness," trace effusion, good range of motion, no instability, "4/5" motor strength in the quadriceps and hamstring, and normal skin. (Tr. 216, 218.) An x-ray further revealed

malalignment.  (Tr. 218.)  Dr. Bert diagnosed right knee tendinitis and right elbow epicondylitis.

(Tr. 215.)  He prescribed  Celebrex and physical therapy.  (Id.)

Six month later, Plaintiff returned to Dr. Bert, complaining of worsening pain.  (Tr. 221.)

She rated her pain as "6" on a scale of one to ten, with ten being the worst.  (Id.)  Dr. Bert,

however, found good range of motion and muscle strength, normal skin and sensation, and no

instability.  (Tr. 222.)  A subsequent MRI of the right knee showed slight thinning of the

patellofemoral compartment, but was otherwise "unremarkable" and showed no evidence of

meniscal tear or ligament injury.  (Tr. 223.)  Dr. Bert later noted that the MRI showed a generally

normal knee and injected the knee with steroids.  (Tr. 224.)

In early 2005, Plaintiff completed eleven physical therapy treatments.  (Tr. 205-13.)  She

reported no improvement, however, in her right knee pain.  (Id.)  The physical therapist

recommended that Plaintiff continue with physical therapy, but Plaintiff did not return for

additional treatment.  (Tr. 206.)  Plaintiff saw Dr. Bert again on February 10, 2005, reporting that

neither the therapy nor steroid injection helped her pain.  (Tr. 228.)

The following month, Plaintiff sought a second orthopedic opinion from Dr. Robert

Knowlan at St. Croix Orthopaedics.  (Tr. 229-30.)  Dr. Knowlan noted, "Throughout the exam,

her pain was much more than I would anticipate."  (Id.)  He further noted, "She has a lot of

problems with her knee.  I believe they are relevant.  This could represent almost an RSD

[Reflex Sympathetic Dystrophy][2] type phenomenon."  (Tr. 230.)  Finding no clear source of

Plaintiff's knee pain, he recommended she see a pain specialist at United Pain Center.  (Id.)

---

[2]      RSD is "a chronic pain syndrome most often resulting from trauma to a single
extremity."  Social Security Ruling 03-2P (Evaluating Cases Involving Reflex Sympathetic
Dystrophy Syndrome/Complex Regional Pain Syndrome), 2003 WL 22399117, at *1.  The
degree of pain reported is often out of proportion to the severity of the precipitating injury.  Id.
A diagnosis of RSD "requires the presence of complaints of persistent, intense pain that results in

Plaintiff was next seen by Dr. Rumsey three times in May 2005.  (Tr. 250-51, 347-48.) An examination of the right knee revealed tenderness but no other abnormalities.  (Tr. 251.)  Dr. Rumsey noted that the right elbow "is fine now" (id.) and that Plaintiff was taking up to eight Vicodin pills per day (Tr. 250).

Plaintiff then saw Dr. Edrie Kioski at United Pain Center on May 27, 2005.  (Tr. 239-44.) On examination, the right knee showed careful but not antalgic gait, slight swelling, significant tenderness, no atrophy of the quadriceps, and a full range of motion.  (Tr. 242.)  Dr. Kioski opined, "I believe this patient has a component of neuropathic leg pain, but I do not find enough evidence to confirm a diagnosis of [RSD]."  (Id.)  He prescribed an antiepileptic drug (Trileptal) for nerve pain, as well as topical creams and patches.  (Tr. 243.)  He noted, "The patient is somewhat reluctant to take medications, but there are not really a lot of options for her otherwise."  (Id.)  Dr. Kioski further noted that Plaintiff smokes one pack per day and "must quit smoking if she wishes for optimal reduction of her nerve pain" due to "a correlation between nerve pain and smoking."  (Tr. 241, 243.)

One month later, Plaintiff returned to United Pain Center and saw nurse practitioner Deborah Hauser to discuss medications and treatment options.  (Tr. 236-38.)  Plaintiff rated her pain as "6-7" out of ten.  (Tr. 236.)  She was not taking the Trileptal prescribed by Dr. Kioski, however, because she was "very against using medications on a routine basis," though she reported taking an average of one to two Vicodin pills per day.  (Id.)  Ms. Hauser noted that Plaintiff was not interested in medication to reduce her pain and declined a prescription for a non-opioid antidepressant for neuropathic pain.  (Id.)

---

impaired mobility of the affected region."  Id. at *2. Further, the complaints of pain are associated with swelling, autonomic instability, abnormal hair or nail growth, osteoporosis, or involuntary movements of the affected region of the initial injury.  Id.  The signs and symptoms of the disorder may worsen over time and spread to other parts of the body if left untreated.  Id.

On August 23, 2005, Plaintiff returned to Dr. Rumsey who noted at the time that Plaintiff was taking up to sixteen Vicodin pills per week. (Tr. 249.) She had no history of chemical dependency, however, and after a urinary toxicology screen, Dr. Rumsey prescribed a Vicodin refill. (Id.) Plaintiff then returned to United Pain Center twice, the first time for a biofeedback assessment (Tr. 233-35) and the second time to see Dr. Kioski again (Tr. 231-32). Dr. Kioski's examination revealed minimal swelling on the right foot and less range of motion in flexion of the toes on the right than the left foot. (Tr. 231.) At that time, Plaintiff rated her pain as "7/10." (Id.) Dr. Kioski concluded, "We do not have much else to offer this patient who is refusing medication treatments." (Id.)

Upon returning to Dr. Rumsey on October 24, 2005, Plaintiff rated her pain as "9 to 10 out of 10 and then goes down to 5 out of 10 after taking medications." (Tr. 245.) Dr. Rumsey noted that Plaintiff "became somewhat tearful at different times during the exam when talking about her disability." (Id.) He also prescribed a Vicodin refill. (Tr. 246.)

Next, Dr. Daniel Sherry examined Plaintiff on January 24, 2006. (Tr. 273-74.) His examination revealed a mild right limp, mild swelling on the right knee but no palpable tenderness, normal extension and flexion, normal range of motion, and normal reflexes. (Tr. 274.) Dr. Sherry suggested that Plaintiff try Ultram (pain medication), but Plaintiff said that she tries to use medication as little as possible. (Id.) Dr. Sherry found a difference in sensation between the right and left lower leg, and referred Plaintiff to a neurologist, Dr. Sotorios Parashos. (Tr. 274, 257.) Plaintiff saw Dr. Parashos two months later. (Tr. 257-58.) His examination revealed normal muscle tone, muscle strength, sensation, and reflexes. (Tr. 257.) He concluded, "I found absolutely no evidence of nerve damage in this lady. The pain characteristics are consistent with causalgia syndrome. The nature of this syndrome is unclear

but it is considered to be a kin [sic] to [RSD].  This is generally treated by either pain specialists or by [a] physiatrist."[3]  (Tr. 258.)

On June 14, 2006, Plaintiff saw Dr. Floyd Anderson, a psychiatrist at Fairview Red Wing Medical Center.  (Tr. 294-97.)  Plaintiff's chief complaint was, "I want to go back to work."  (Tr. 294.)  Dr. Anderson noted that Plaintiff was "a slight bit exaggerating when she describe[d] her pain symptoms," "denie[d] any wish for Social Security disability management," and opposed taking routine medications due to a family history of chemical dependency.  (Tr. 295-96.)  Dr. Anderson diagnosed Plaintiff with possible mild personality disorder, causalgia of the right leg, and assigned a current Global Assessment of Functioning ("GAF") score of 50 with a GAF score of 60 maximum in the past year.[4]  (Tr. 296.)  He prescribed Neurontin to be taken together with Vicodin.  (Id.)

Plaintiff returned to Dr. Sherry on several occasions thereafter (Tr. 267-73), including an examination of the right hand on July 26, 2006, which revealed minimal swelling and tenderness but no other abnormalities (Tr. 271).  Additionally, an x-ray of the right hand was normal.  (Tr. 278.)

---

[3]     A physiatrist is a physician who specialize in physical medicine.  Stedman's Medical Dictionary 1493 (28th ed. 2006).

[4]     "According to the Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. Text Revision 2000) [hereinafter DSM-IV-TR], the [GAF] Scale is used to report 'the clinician's judgment of the individual's overall level of functioning.'"  Hudson ex rel. Jones v. Barnhart, 345 F.3d 661, 663 n.2 (8th Cir. 2003).  "GAF scores of 41 to 50 reflect '[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).'"  Id. (quoting DSM-IV-TR at 34).  "GAF scores of 51-60 indicate '[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).'"  Id. (quoting DSM-IV-TR at 34).

On August 23, 2006, Plaintiff saw Dr. Anderson again and reported that she was taking six Vicodin pills per day.  (Tr. 293.)  Dr. Anderson noted,

> The patient continues to reiterate how she would want to be off of pills, and yet she has on her own increased her dose of Vicodin fairly dramatically. . . . The patient is tearful as I describe my position on chronic pain management.  I tell her that unless she is able to advance her overall level of function that I am not willing to follow her along indefinitely giving her narcotic analgesics.  She cries when I give her this news.

(Id.)

Later that same day, Plaintiff saw Dr. Sherry and told her that she was taking four Vicodin pills per day.  (Tr. 270.)  Dr. Sherry noted that Plaintiff was upset as she was hoping Dr. Anderson would have a "miracle type cure."  (Id.)  About two weeks later, Plaintiff returned to Dr. Sherry who found some decreased sensation of the right forearm.  (Tr. 269.)  Dr. Sherry recommended increasing the Neurontin prescribed by Dr. Anderson.  (Id.)  About a week later, Plaintiff again saw Dr. Sherry.  (Tr. 268-69.)  Plaintiff had recently begun developing pain in the right elbow and hand.  (Tr. 268.)  An examination of the hands revealed full range of motion and no swelling.  (Id.)  An examination of the knees revealed "a diffuse kind of touchy hypersensitive tenderness in the right knee" but no other abnormalities.  (Id.)  Dr. Sherry concluded, "My overall impression with [Plaintiff] is that she probably has an RSD like response to her injury.  I think there is a fair amount of anger and depression that overlies this but I cannot find any true physical pathology to recommend orthopedic treatment for her."  (Id.)  Dr. Sherry recommended that Plaintiff revisit biofeedback and referred her to Dr. David Asp, a psychologist.  (Tr. 268-69.)

On September 15, 2006, Plaintiff saw Dr. Asp.  (Tr. 289.)  Plaintiff came to tears several times.  (Tr. 290.)  She  admitted to being depressed but was unwilling to take an antidepressant as she was against medications.  (Id.)  Dr. Asp noted that she smoked ten to twenty cigarettes per

day.  (Tr. 291.)  Dr. Asp assessed Plaintiff with a Beck Depression Inventory score of 13,

indicating a minimally depressed person (Tr. 292), and assigned a GAF score of 62 (Tr. 293).

Plaintiff continued to see Dr. Asp for biofeedback and therapy until November 27, 2006.  (Tr.

259-64, 284-89.)

On January 2, 2007, Plaintiff returned to Dr. Sherry, this time for depression.  (Tr. 266-

67.)  Dr. Sherry noted that Plaintiff had some suicidal thoughts and went to the emergency room

over the weekend, because her boyfriend moved out after her son made threatening remarks to

him.  (Tr. 267.)  Dr. Sherry started her on Lexapro.  (Id.)  A week later, Plaintiff again saw

psychologist Dr. Asp who diagnosed her with major depressive disorder (anxiety state) and

chronic pain, and assigned a current GAF score of 50.   (Tr. 281-84.)

Two days later, Plaintiff consulted with Dr. Robb Rutledge about her right arm and right

leg pain.  (Tr. 265-66.)  Dr. Rutledge found no abnormalities, concluding,

> My impression is this patient is primarily suffering from chronic pain syndrome and
> depression.  I can't find any objective orthopedic pathology to speak of . . . . One of her
> main reasons to be seen today by me was to be rated for the possibility of permanent
> disability for work purposes.  I can't really find an orthopedic reason for that, but I do
> agree that she is functionally unable to work due to the extreme nature of her dysfunction.
> . . . I would like to recommend that a psychiatrist be consulted.

(Tr. 266.)

Plaintiff next saw Dr. Sherry three times in January and February 2007 for management

of her prescriptions.  (Tr. 265, 301-02.)  Plaintiff reported that she felt "much better emotionally"

and that Lyrica "really was helping her joints."  (Tr. 301.)

On June 14, 2007, Plaintiff saw Dr. Alford Karayusuf for a psychological examination in

connection with her claim for disability benefits.  (Tr. 307-09.)  Dr. Karayusuf noted that

Plaintiff bathes, makes her bed, dusts, vacuums, and washes the dishes every day.  (Tr. 308.)

Additionally, she cooks, goes grocery shopping, drives, cleans her house, and does laundry once

a week.  (Id.)  He diagnosed depression with anxiety, concluding,

> She is able to understand, retain, and follow simple instructions.  She is restricted to brief,
> superficial interactions with fellow workers, supervisors and the public.  Within these
> parameters she is able to maintain pace and persistence.  These conclusions are based on
> her psychiatric and not her physical condition.

(Tr. 309.)

On June 25, 2007, Dr. Gregory Salmi completed a form regarding Plaintiff's physical

residual functional capacity.  (Tr. 213-20.)  Dr. Salmi concluded that Plaintiff could occasionally

lift twenty pounds; frequently lift ten pounds; stand and/or walk about six hours in an 8-hour

work day; and had no other postural, manipulative, visual, communicative, or environmental

limitations.  (Tr. 314-17.)  Dr. Charles Grant subsequently affirmed Dr. Salmi's assessment, and

further noted that Plaintiff "quit going to pain clinic" and that he "[w]ould not further reduce

Light [residual functional capacity]."  (Tr. 367-69.)

On June 29, 2007, Ken Neville, Ph.D. completed a form regarding Plaintiff's mental

impairments.  (Tr. 321-35.)  Dr. Neville found Dr. Karayusuf's opinion to be consistent with the

medical record and gave it weight.  (Tr. 334.)  He further opined that Plaintiff had only "mild"

degree of limitation in the following: activities of daily living; maintaining social functioning;

and maintaining concentration, persistence, or pace.  (Tr. 332.)  Dr. Neville also found no

episodes of decompensation.  (Id.)  Ray Conroe, Ph.D. subsequently affirmed Dr. Neville's

assessment.  (Tr. 364-66.)

In August 2007, Plaintiff reestablished primary care with Dr. Rumsey and saw him three

times over the following month.  (Tr. 350-51, 349, 345-46.)  Dr. Rumsey wrote Plaintiff a note

for her disability application, which stated, "Advising longterm disability from [RSD] and severe

depression." (Tr. 341.)  Dr. Rumsey noted the following in Plaintiff's record: "Note for SSI written that I suspect patient will have long-term employment compromise."  (Tr. 349.)

Plaintiff next saw Dr. Rumsey three times in April and May 2008.  (Tr. 395-97.)  Among other things, he recommended that Plaintiff establish treatment with a psychiatrist, begin pain clinic evaluation and treatment, discontinue tobacco use, and increase physical activity.  (Tr. 396-97.)

On June 17, 2008, Plaintiff saw Dr. Ryan Dick requesting a letter verifying her disability. (Tr. 391, 393-94.)  Dr. Dick examined Plaintiff and found tenderness, but noted that she had "no problem with ambulation of any kind, which is a little unusual considering her extreme pain to even light touch of her lower extremity."  (Tr. 393.)  Further, Dr. Dick reviewed an April 2008 note from Dr. Lisa Vollmer at United Pain Clinic.  (Tr. 391.)  Dr. Vollmer evaluated Plaintiff for 80 minutes and did not feel that she met the criteria for Complex Regional Pain Syndrome.[5]  (Tr. 393.)  Dr. Dick concluded,

> it became evident that [Plaintiff] needed a note stating that she did indeed have swelling in her upper extremities in order to verify that she indeed had a diagnosis of complex regional pain syndrome and that she was unsatisfied with the fact that the previous doctor that she saw, I am assuming is Dr. Vollmer, was unable to find swelling.

(Tr. 391.)  He opined that Plaintiff "would benefit from psychiatry supervision as well as a psychologist as this seems to be a huge part of her pain syndrome."  (Tr. 394.)

On July 29, 2008, psychologist Maureen Gluek saw Plaintiff and completed a form, provided by her attorney, regarding her ability to do work-related activities.  (Tr. 373-77.)  Dr. Gluek determined that Plaintiff had "Unlimited/Very Good" ability to do the following: follow work rules; relate to co-workers; deal with the public; use judgment; and interact with

---

[5]     RSD is frequently known as Complex Regional Pain Syndrome.  Social Security Ruling 03-2P, 2003 WL 22399117, at *1.

supervisors.  (Tr. 375.)  She also found that Plaintiff had "Fair" ability to demonstrate reliability and understand, remember, and carry out simple job instructions.  She further found that Plaintiff had "Poor or None" ability to do the following: deal with work stress; function independently; maintain attention/concentration; understand, remember, and carry out complex job instructions; understand, remember, and carry out detailed, but not complex, job instructions; maintain personal appearance; behave in an emotionally stable manner; and relate predictably in social situations.  (Tr. 376.)  Dr. Gluek concluded that she did not believe Plaintiff was able to work and that her impairments would cause her to be absent from work more than three times per month.  (Tr. 377.)

Finally, on September 9, 2008, Dr. Rumsey completed a residual functional capacity questionnaire (Tr. 378-83) provided by Plaintiff's lawyer (Tr. 388).  Dr. Rumsey opined that Plaintiff's frequent symptoms interfere with the attention and concentration needed to perform even simple work tasks during a typical work day.  (Tr. 380.)  He further found that Plaintiff can sit or stand for thirty minutes at one time, and sit/stand/walk for about two hours total in an 8-hour work day.  (Tr. 381.)  He also indicated that Plaintiff needs more than ten breaks (lasting ten to twenty minutes each) during an 8-hour work day, and that her legs need to be elevated with prolonged sitting, including 90% of the day at a sedentary job.  (Tr. 382.)  According to Dr. Rumsey, Plaintiff cannot lift and carry anything more than ten pounds, but did not need a cane or other assistance.  (Id.)  Dr. Rumsey also found that Plaintiff can twist and bend only rarely, and grasp, turn, perform fine manipulation, and reach 20% with the right arm and 100% with the left arm during an 8-hour work day.  (Tr. 383.)  Finally, Dr. Rumsey estimated that Plaintiff would miss more than four days of work per month.  (Id.)  Plaintiff saw Dr. Rumsey three more times in 2009 for follow up.  (Tr. 385-86.)

### THE ADMINISTRATIVE HEARING

Plaintiff was represented by counsel at the hearing before the ALJ (Tr. 23) and testified as follows.  She worked as a painter after her August 2003 motorcycle accident until she was "let [] go" in the beginning of July 2004.  (Tr. 26.)  She then collected unemployment benefits for six months.  (Id.)  She was unable to find other work because of doctor appointments and her right knee was "giving out a lot."  (Tr. 27.)

Constant pain on the right side is keeping Plaintiff from working.  (Id.)  She described this pain as follows:

> From my shoulder all the way down in my fingertips, my right hip up in my appendix area, and it goes around in my back and basically down into my crotch.  And then all the way down to my toes on my right side, and the bottom of both of my feet.

(Tr. 30.)  The pain is sharp, throbbing, and burning, and started in her right knee after the accident.  (Id.)  It gets worse with increased movement and changing weather.  (Tr. 33.)  Specifically, the cold affects her and she spends most of the winter in bed.  (Tr. 29.)  Plaintiff understands that her pain is caused by "RSD, fibromyalgia and salga [phonetic] or something like that."  (Tr. 36 (alteration in original).)  Plaintiff also has problems with depression, concentration, and memory.  (Tr. 33-34.)

Plaintiff was taking more than ten Vicodin pills per day for the pain.  (Tr. 35.)  The Vicodin was not working and, as a result, Dr. Rumsey changed her medication to Oxycodone. (Tr. 27, 35-36.)  She was taking up to six Oxycodone pills per day at the time of the hearing. (Tr. 35-36.)  She indicated that Oxycodone helps with the pain and has no side effects.  (Tr. 32.)  Hot baths also make her feel better.  (Id.)

Plaintiff cannot exercise other than walking around the house.  (Tr. 38.)  She previously did water therapy but stopped when she switched her medication to Oxycodone.  (Id.)  Dr. Rumsey wanted her to get used to Oxycodone before revisiting water therapy.  (Id.)

Plaintiff testified that her daughter and friend help her with meal preparation and house cleaning.  (Tr. 28.)  Specifically, her daughter helps with vacuuming, dusting, and laundry.  (Tr. 31-32.)  Plaintiff cleans the toilet and does some shopping by herself.  (Tr. 32.)  She also drives two blocks to the gas station, but has trouble with stair climbing, kneeling on her right knee, and using her right hand.  (Tr. 29.)  For example, she drops her coffee cup when using her right hand.  (Id.)  She also has difficulty dressing because of pain from clothes touching her skin.  (Tr. 36-37.)

Robert Brezinsky testified at the hearing as a vocational expert (VE).  (Tr. 39.)  The ALJ posed some hypothetical questions to the VE about the type of work a person with Plaintiff's age, education, working history, and impairments could perform.  In the first hypothetical question, the ALJ restricted the person to lifting twenty pounds occasionally and ten pounds frequently; standing and sitting six hours each in an 8-hour work day; occasional climbing, balancing, stooping, kneeling, crouching, and crawling; occasional exposure to cold, heat, wetness, heights, and moving parts; and occasional interaction with the public, co-workers, and supervisors.  (Tr. 40.)  The VE testified that such a person could not perform Plaintiff's past work, but could perform other work such as a cleaner, bench/small product assembler, and mail clerk.  (Tr. 40-41.)

In the second hypothetical question, the ALJ limited the person to lifting ten pounds occasionally and five pounds frequently, standing two hours and sitting six hours in an 8-hour work day, and sitting/standing at will, but everything else was the same as the first hypothetical.

(Tr. 42.)  The VE testified that such a person could perform work such as a sedentary bench assembler (e.g., a final assembler in the optical goods area) or a surveillance system monitor. (Id.)

In the third hypothetical question, the ALJ limited the person to being unable to work an 8-hour work day but everything else was the same as the second hypothetical.  (Id.)  The VE testified that such a person could not perform any work.  (Id.)

### THE ALJ'S DECISION

On October 27, 2009, the ALJ issued his decision denying Plaintiff's application for disability insurance benefits.  (Tr. 9-20.)  The ALJ followed the five-step sequential evaluation set forth in the agency's regulations.  See 20 C.F.R. § 404.1520(a).  The Eighth Circuit Court of Appeals has summarized these steps as follows: (1) whether the claimant is currently engaged in "substantial gainful activity," (2) whether the claimant suffers from a severe impairment that "significantly limits the claimant's physical or mental ability to perform basic work activities," (3) whether the claimant's impairment "meets or medically equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education and work experience)," (4) whether the claimant has the residual functional capacity to perform her relevant past work; and (5) if the ALJ finds that the claimant is unable to perform her past relevant work, then the burden is on the ALJ "to prove that there are other jobs in the national economy that the claimant can perform."  Fines v. Apfel, 149 F.3d 893, 894-95 (8th Cir. 1998).

At the **first** step of the sequential evaluation process, the ALJ determined that Plaintiff engaged in substantial gainful activity since her alleged onset date of  September 2, 2003.  (Tr. 14.)  It was not clear from the record, however, that she worked throughout the entire period at

issue, and thus, the ALJ gave her "the benefit of the doubt" and proceeded with his analysis.

(Id.)  At the **second** step of the evaluation, the ALJ found that Plaintiff had severe impairments of depression and RSD.  (Tr. 14.)  At the **third** step of the evaluation, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Id.)  At the **fourth** step of the evaluation, the ALJ determined that Plaintiff had the residual functional capacity to perform unskilled light work as defined in 20 C.F.R. § 404.1567(b).[6]  (Tr. 16.)  The ALJ also found that she was limited to six hours of standing/walking and sitting during an 8-hour work day.  (Tr. 19.)  Furthermore, she was limited to occasional climbing of stairs/ladders, balancing, stooping, kneeling, crouching, crawling, working in areas of cold/humid/wet extremes, exposure to environmental hazards, and interaction with coworkers, supervisors, and the public.  (Id.)  Next, the ALJ determined that, given Plaintiff's residual functional capacity, she was unable to perform her past relevant work.  (Id.)  At the **fifth** step of the evaluation, the ALJ found that, based on the VE's testimony, jobs existed in significant numbers in the national economy that she could perform given her residual functional capacity.  (Tr. 19-20.)  Accordingly, the ALJ concluded that Plaintiff was not disabled, as defined in the Social Security Act, at any time from the alleged onset date through September 30, 2009, the date last insured.  (Tr. 20.)

---

[6] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).

**DISCUSSION**

## I.   <u>Standard of Review</u>

Review by this Court is limited to a determination of whether a decision of the ALJ is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); <u>Davidson v. Astrue</u>, 578 F.3d 838, 841 (8th Cir. 2009).  "Substantial evidence 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  <u>Brace v. Astrue</u>, 578 F.3d 882, 884 (8th Cir. 2009) (quoting <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)).  "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings."  <u>Gavin v. Heckler</u>, 811 F.2d 1195, 1199 (8th Cir. 1987).  "'Substantial evidence on the record as a whole' . . . requires a more scrutinizing analysis."  <u>Id.</u>

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact.  <u>Woolf v. Shalala</u>, 3 F.3d 1210, 1213 (8th Cir. 1993).  The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion.  <u>Mitchell v. Shalala</u>, 25 F.3d 712, 714 (8th Cir. 1994); <u>see also</u> <u>Woolf</u>, 3 F.3d at 1213 (the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding).  Instead, the Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  <u>Gavin</u>, 811 F.2d at 1199.

The claimant bears the burden of proving his or her entitlement to disability benefits.  <u>See</u> 20 C.F.R. § 404.1512(a); <u>Thomas v. Sullivan</u>, 928 F.2d 255, 260 (8th Cir. 1991).  Once the claimant has demonstrated he or she cannot perform prior work due to a disability, the burden of proof shifts to the Commissioner to show that the claimant can engage in some other substantial gainful activity.  <u>See</u> <u>Moore v. Astrue</u>, 572 F.3d 520, 523 (8th Cir. 2009).

## II.   <u>Analysis</u>

Plaintiff raises several arguments.  First, she contends the ALJ failed to fully and fairly develop the record with respect to her mental impairment of depression.  Second, Plaintiff contends the ALJ evaluated her impairment of RSD under the wrong listing.  Third, she argues the ALJ failed to properly assess her residual functional capacity by not giving her treating physician's opinion controlling weight and not recontacting him to resolve any alleged inconsistencies.  Finally, Plaintiff argues the ALJ's hypothetical question to the VE was improper.  The Court addresses each of these arguments in turn.

### A.   <u>The ALJ Fully and Fairly Developed the Record with Respect to Plaintiff's Impairment of Depression.</u>

The ALJ found that Plaintiff had a severe impairment of depression, but that it did not meet or equal a listing.  (Tr. 14-15.)  Plaintiff argues that the ALJ failed to fully and fairly develop the record with respect to her depression by not obtaining Dr. Gluek's (psychologist) treatment notes and including them in the record.  Defendant contends that (1) the ALJ reasonably evaluated and discounted Dr. Gluek's opinion, (2) it was Plaintiff's burden to present medical evidence proving her disability, and (3) in any event, obtaining the treatment notes would not have changed the ALJ's conclusion and, thus, any error was harmless.  The Court finds that the ALJ fully and fairly developed the record with respect to Plaintiff's depression.

It is well settled that the ALJ has a responsibility to develop the record fully and fairly, even when, as in this case, the claimant is represented by counsel.  <u>Nevland v. Apfel</u>, 204 F.3d 853, 857 (2000).  Reversal due to failure to develop the record, however, is only warranted where such failure is unfair or prejudicial.  <u>Haley v. Massanari</u>, 258 F.3d 742, 750 (8th Cir. 2001); <u>Onstad v. Shalala</u>, 999 F.2d 1232, 1234 (8th Cir.1993).  For example, in <u>Shannon v. Chater</u>, 54 F.3d 484 (8th Cir. 1995), the court stated:

Although the ALJ has a duty to develop the record despite the claimant's representation by counsel, the fact that Shannon's counsel did not obtain (or, so far as we know, try to obtain) the items Shannon now complains of suggests that these alleged treatments have only minor importance.

. . . The substance of Shannon's alleged other medical visits is unclear at best, and Shannon has not indicated that those visits should be regarded as dispositive for purposes of his claim. Shannon was treated fairly, and he has failed to show that he was prejudiced.

Id. at 488. Accordingly, the court affirmed the ALJ's denial of benefits. Id.; see also Onstad, 999 F.2d at 1234 (finding claimant was not prejudiced by omission of medical records where claimant's lawyer did not obtain or try to obtain same).

Here, Plaintiff has made no showing that the ALJ would have decided differently had he obtained Dr. Gluek's treatment notes.[7] As in Shannon, Plaintiff has not revealed anything regarding the substance of those documents, let alone how they would change the outcome of the case. Further, there is no evidence that Plaintiff or her counsel obtained or tried to obtain those documents, which suggests that they have only minor importance. Indeed, after receiving the ALJ's decision, Plaintiff could have submitted additional medical records to the Appeals Council, see 20 C.F.R. § 416.1476(b)(1), but did not do so. (Tr. 6-8.) As the claimant, Plaintiff bears the burden of proving her disabilities and, thus, has "the responsibility for presenting the strongest case possible." Thomas, 928 F.2d at 260. Under these circumstances, it is reasonable to conclude, as in Shannon, that the documents were of little importance to Plaintiff's claim and Plaintiff was not unfairly prejudiced by their omission.

---

[7] Defendant suggests that such treatment notes may not even exist. The only medical records from Dr. Gluek is a form, provided by Plaintiff's attorney, regarding her ability to do work-related activities. (Tr. 373-77.) That form states that it should be based on an examination, but not necessarily treatment. Dr. Rumsey's records from an April 2008 visit, however, indicated the following: "Sees Maureen Gluek every 2 weeks." (Tr. 397.) In any event, as described above, Plaintiff has not shown how she was unfairly prejudiced by omission of the records.

Plaintiff further argues that the ALJ discounted Dr. Gluek's opinion because "it was not well-supported" and failed to explain how he arrived at that conclusion without reviewing Dr. Gluek's treatment notes. (Pl.'s Mem. at 16-17.) The ALJ, however, did not discount Dr. Gluek's opinion because it was not well-supported. Rather, he gave several reasons for discounting it, none of which were that it was not well-supported. (Tr. 19.) Specifically, the ALJ found that Dr. Gluek's opinion regarding Plaintiff's mental limitations (1) was internally inconsistent,[8] (2) was inconsistent with other evidence, and (3) concluded that Plaintiff was unable to work, which is an opinion reserved solely to the Commissioner. (Tr. 18.) See Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006) ("A treating physician's own inconsistency may also undermine his opinion and diminish or eliminate the weight given his opinions."); 20 C.F.R. § 404.1527(d) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."); id. § 404.1527(e) (medical source's statement that claimant is "disabled" or "unable to work" is not a medical opinion but, instead, is an opinion on an issue reserved to the Commissioner).   In sum, the ALJ gave good reasons for giving Dr. Gluek's opinion little weight, none of which were that it was not well-supported. See Davidson v. Astrue, 501 F.3d 987, 990 (8th Cir. 2007) ("When an ALJ discounts a treating physician's opinion, he should give 'good reasons' for doing so."). Therefore, the Court must reject the Plaintiff's argument.

## B.      The ALJ Evaluated Plaintiff's RSD Under the Correct Listing.

The regulations provide that certain impairments are considered "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or

---

[8]      The form that Dr. Gluek completed indicated that Plaintiff has "Unlimited/Very Good" ability to: follow work rules, relate to coworkers, deal with the public, use judgment, and interact with supervisors. Yet, Dr. Gluek indicated on the same form that Plaintiff could not behave in an emotionally stable manner. (Tr. 18, 374-77.)

work experience." 20 C.F.R. § 404.1525(a). Such conditions are described in the Listing of

Impairments, 20 C.F.R. § 404, Subpart P, Appendix 1. It is the claimant's burden to prove she

meets or medically equals a listed impairment. Carlson v. Astrue, 604 F.3d 589, 593 (8th Cir.

2010). Plaintiff argues that RSD is a neurological disorder, and the ALJ should have evaluated

her RSD under the listing for neurological disorders (section 11.00 of the Listing of

Impairments) rather than musculoskeletal disorders (section 1.00). This argument is unavailing.

> As an initial matter, RSD "is not a listed impairment" and, thus,
>
>> an individual with [RSD] alone cannot be found to have an impairment that meets the
>> requirements of a listed impairment. However, the specific findings in each case should
>> be compared to *any pertinent listing* to determine whether medical equivalence may
>> exist. Psychological manifestations related to [RSD] should be evaluated under the
>> mental disorders listings, and consideration should be given as to whether the
>> individual's impairment(s) meets or equals the severity of a mental listing.

Social Security Ruling 03-2P, 2003 WL 22399117, at *6 (footnote omitted) (emphasis added).

Because RSD is not a listed impairment, Plaintiff's argument that the ALJ should have evaluated

her RSD under a specific listing is misplaced. Consistent with Social Security Ruling 03-2P, the

ALJ analyzed Plaintiff's RSD under any pertinent listing—specifically, the listing for

musculoskeletal disorders—and found that there was "no evidence of major dysfunction of a

joint, disorder of the spine, or any of the specific neurological deficits required under [that]

section." (Tr. 15.) The ALJ then analyzed Plaintiff's depression (a psychological manifestation

related to her RSD) under the listing for mental disorders (section 12.04) and found that it did not

satisfy the "paragraph B" or "paragraph C" criteria and, therefore, did not meet or equal that

listing. (Id.) Plaintiff does not challenge these findings.

Additionally, Plaintiff merely asserts in a conclusory manner that the ALJ should have

evaluated her RSD as a neurological disorder. Yet, she does not contend that her impairments

satisfy any of the listings for neurological disorders, let alone cite any medical evidence that

would support such an argument.[9]  Plaintiff fails to bear her burden of proving that she meets or

equals a listing.  See Marburger v. Astrue, No. 10-745, 2011 WL 1327641, at *5 (W.D. Pa. Mar.

17, 2011) (stating that, although claimant is not required to identify the appropriate listing for

consideration, she must present sufficient evidence of per se disability under that listing to

trigger the ALJ's duty to conduct an analysis under that listing); see also Carlson, 604 F.3d at

593 (stating that claimant has burden of proving that she meets or equals a listing).  Thus, the

Court finds no basis for disturbing the ALJ's finding that Plaintiff did not meet or equal a listing.

**C.      The ALJ Properly Assessed Residual Functional Capacity.**

Plaintiff argues that the ALJ should have given controlling weight to her treating

physician's (Dr. Rumsey) residual functional capacity opinion.  Additionally, Plaintiff argues

that the ALJ should have recontacted Dr. Rumsey to resolve any inconsistencies.  The Court

finds these arguments unavailing.

***Weight given to Dr. Rumsey's opinion.***  Dr. Rumsey opined that Plaintiff should receive

long-term disability due to her RSD and depression.  (Tr. 341.)  He also completed a residual

functional capacity questionnaire, provided by Plaintiff's lawyer, wherein he opined that her

frequent symptoms interfere with the attention and concentration needed to perform even simple

work tasks during a typical work day.  (Tr. 378-83.)  The ALJ gave Dr. Rumsey's opinion "little

weight" in assessing Plaintiff's residual functional capacity.  (Tr. 18.)

A treating physician's opinion on the issue of the nature and severity of the claimant's

impairment is entitled to controlling weight only if it is well-supported by medically acceptable

clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence

---

[9]       Such an argument would be inconsistent with the medical record.  For example, Dr.
Parashos, a neurologist, examined Plaintiff and opined, "I found absolutely no evidence of nerve
damage in this lady."  (Tr. 258.)

in the record.  20 C.F.R. § 404.1527(d)(2).  If the ALJ does not grant controlling weight to a

treating physician's opinion, the ALJ determines how much weight to grant by applying the

following factors:

> (1) whether the source has examined the claimant; (2) the length, nature and extent of the treatment relationship and the frequency of examination; (3) the extent to which the relevant evidence, "particularly medical signs and laboratory findings," supports the opinion; (4) the extent to which the opinion is consistent with the record as a whole; (5) whether the opinion is related to the source's area of specialty; and (6) other factors "which tend to support or contradict the opinion."

Owen v. Astrue, 551 F.3d 792, 800 (8th Cir. 2008) (citing 20 C.F.R. §§ 404.1527(d),

416.927(d)).

Plaintiff argues that the residual functional capacity opinion of Dr. Rumsey was well-

supported by medically acceptable clinical and laboratory techniques because it was based on

"the review and evaluation of the reports of other doctors who have examined [Plaintiff]."  (Pl.'s

Mem. at 19.)  Plaintiff misconstrues the record.  Having reviewed the medical records from Dr.

Rumsey, the Court finds nothing that indicates he based his opinion on reports of other doctors.

Nor has the Plaintiff provided a citation to the record to support that argument.

Plaintiff further argues that Dr. Rumsey's opinion was not inconsistent with other

substantial evidence in the record and the ALJ has not identified an examining medical source

expressing an inconsistent opinion.  (Tr. 19.)  Quite to the contrary, Dr. Rumsey's opinion was

inconsistent with other substantial evidence in the record.  Other doctors who examined Plaintiff

were unable to determine the source of her pain, with one refusing to provide her a letter in

support of her disability application.  See, e.g., Tr. 222 (Dr. Bert finding good range of motion

and muscle strength, normal skin and sensation, and no instability); Tr. 230 (Dr. Knowlan

finding no clear source of knee pain); Tr. 242 (Dr. Kioski not finding enough evidence to

confirm a diagnosis of RSD); Tr. 258 (Dr. Parashos finding "absolutely no evidence of nerve

damage in this lady"); Tr. 266 (Dr. Rutledge opining that Plaintiff "is functionally unable to

work" but also admitting that he could not "really find[] an orthopedic reason for that"); Tr. 391

(Dr. Dick declining to write a letter verifying disability because he agreed with Dr. Vollmer who

did not feel Plaintiff met the criteria for RSD). Thus, Plaintiff's argument is meritless.

Additionally, the Court finds that the ALJ gave at least three good reasons for according

little weight to Dr. Rumsey's opinion. See Hamilton v. Astrue, 518 F.3d 607, 610 (8th Cir.

2002) ("Whether the ALJ gives great or small weight to the opinions of treating physicians, the

ALJ must give good reasons for giving the opinions that weight"). First, the ALJ rightly noted

that Dr. Rumsey's opinion that Plaintiff is disabled cannot be given special significance because

that is an issue reserved solely to the Commissioner. See 20 C.F.R. § 404.1527(e).

Second, the ALJ determined that Dr. Rumsey did not identify any medical or psychiatric

evidence that informed his opinion and, as such, he did not give it controlling weight. (Tr. 18.)

See 20 C.F.R. § 404.1527(d)(3) ("The more a medical source presents relevant evidence to

support an opinion, particularly medical signs and laboratory findings, the more weight we will

give that opinion."). Indeed, Dr. Rumsey opined—in a single sentence without explanation—

that Plaintiff should receive long-term disability. (Tr. 341.) See Hamilton, 518 F.3d at 610

("[A] treating physician's opinion does not deserve controlling weight when it is nothing more

than a conclusory statement."). Furthermore, Dr. Rumsey's own treatment notes do not support

the residual functional capacity questionnaire that he completed. See, e.g., Tr. 254-55 (no

mention of limitations); Tr. 253 (same); Tr. 250 (same); Tr. 251 (same); Tr. 249 (same); Tr. 245-

46 (same); Tr. 397 (recommending that Plaintiff "[i]ncrease physical activity"). As such, the

ALJ acted properly in disregarding it. See Pirtle v. Astrue, 479 F.3d 931, 933 (8th Cir. 2007)

("When a treating physician's notes are inconsistent with his or her residual functional capacity

assessment, we decline to give controlling weight to the residual functional capacity assessment."); Choate v. Barnhart, 457 F.3d 865, 870 (8th Cir. 2006) (ALJ did not err in discounting physician's opinion on claimant's limitations because physician's treatment notes make no mention of them).

Third, the ALJ found that Dr. Rumsey's opinion appeared to be based more on Plaintiff's subjective complaints rather than on medical evidence. (Tr. 19.) The ALJ found that Plaintiff's subjective complaints lacked credibility. (Tr. 16-17.) Plaintiff has not challenged this finding. Therefore, the ALJ properly disregarded Dr. Rumsey's opinion which was based on Plaintiff's discredited, subjective complaints. See Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000) (ALJ may discount physician's opinion that is based on subjective complaints).

For all of the reasons above, the Court finds that substantial evidence supports the ALJ's decision to accord little weight to Dr. Rumsey's opinion in assessing Plaintiff's residual functional capacity.

***Recontacting Dr. Rumsey.*** Plaintiff argues that the regulations required the ALJ to recontact Dr. Rumsey to resolve any inconsistencies, rather than discounting his opinion. The Court disagrees. "While the ALJ has an independent duty to develop the record in a social security disability hearing, the ALJ is not required 'to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped.'" Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005) (quoting Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004)). The regulations explain that the ALJ should recontact a treating physician if the evidence provided by that physician "is inadequate for [the ALJ] to determine whether [claimant] is disabled" such as "when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based

on medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1512(e).

"The regulations do not require an ALJ to recontact a treating physician whose opinion was

inherently contradictory or unreliable. This is especially true when the ALJ is able to determine

from the record whether the applicant is disabled." Hacker, 459 F.3d at 938.

Here, the ALJ did not find that Dr. Rumsey's opinion was inadequate, unclear, or

incomplete. Nor did it find that Dr. Rumsey used unacceptable clinical and laboratory diagnostic

techniques. Instead, the ALJ discounted Dr. Rumsey's opinion because it was conclusory,

unsupported by medical or psychiatric evidence, and based on Plaintiff's subjective complaints.

In such cases, an ALJ may discount an opinion without seeking clarification.

> ### D.     The ALJ Based His Decision on a Proper Hypothetical Question.

Plaintiff argues that the VE's testimony was not substantial evidence to support the ALJ's

decision, because the ALJ failed to ask him a hypothetical question that contained all of her

limitations. Specifically, Plaintiff contends that the ALJ should have included in his hypothetical

question limitations consistent with the residual functional capacity opinions of Dr. Rumsey and

Dr. Gluek. However, "[t]he hypothetical question need only include those impairments and

limitations found credible by the ALJ." Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir.

2005); see also Lacroix v. Barnhart, 465 F.3d 881, 889 (8th Cir. 2006) ("The ALJ's hypothetical

question to the vocational expert needs to include only those impairments that the ALJ finds are

substantially supported by the record as a whole." (internal quotations omitted)). Here, the ALJ

properly discredited Dr. Rumsey and Dr. Gluek's opinions regarding Plaintiff's limitations.

Thus, the ALJ's hypothetical question was proper and, as such, the VE's answer constituted

substantial evidence supporting the ALJ's decision.

## RECOMMENDATION

Being duly advised of all the files, records, and proceedings here, **IT IS HEREBY**

**RECOMMENDED THAT:**

    1.      Plaintiff's Motion for Summary Judgment [Docket No. 15] be denied;

    2.      Defendant's Motion for Summary Judgment [Docket No. 19] be granted;

    3.      Judgment be entered accordingly.

Dated:  August 1, 2011

                                           s/ Arthur J. Boylan
                              Chief Magistrate Judge Arthur J. Boylan
                              United States District Court

       Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and by serving upon all parties written objections that specifically identify the portions of the Report to which objections are made and the basis of each objection.  This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals. Written objections must be filed with the Court before August 15, 2011.